UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 JUL 27  PM 2: 25

BY _____ CLERK
DEPUTY CLERK

MARCELLA RYAN and )
JOHN HERBERT, )
on behalf of themselves and )
all others similarly situated, )
  )
    Plaintiffs, )
  )
      v. )    Case No. 5:14-cv-00269
  )
SYLVIA MATHEWS BURWELL, )
Secretary of Health and Human Services, )
  )
    Defendant. )

**OPINION AND ORDER RE:**
**DEFENDANT'S MOTION TO DISMISS**
**(Doc. 19)**

Plaintiffs Marcella Ryan and John Herbert are Medicare beneficiaries who receive home health care services. They allege that the Secretary of Health and Human Services has systematically failed to follow her own regulations and guidance governing appeal of Medicare coverage for home health care services, resulting in the improper denial of their claims. Before the court is defendant's motion to dismiss.

### I.    Facts

### A.    Medicare and Medicaid

In 1965, President Lyndon B. Johnson signed the Medicare and Medicaid statutes into law at a signing ceremony attended by former President Truman. Title XVIII of the Social Security Act, known as Medicare, is a federal health insurance program for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395*lll*. It contains four programs. Part A provides "basic protection against the costs of hospital, related post-hospital, home health services, and hospice care" for persons over sixty-five years of age and others. *Id*. §§ 1395c-1395i-5. Part B is a voluntary program that provides supplementary medical insurance benefits to persons who purchase the insurance. *Id*. §§ 1395j-1395w-5. Part C allows individuals to receive these

1

benefits through private insurers rather than traditional Medicare. *Id*. §§ 1395w-21-1395w-29. Part D provides prescription drug coverage through enrollment in private insurance plans. *Id*. §§ 1395w-101-1395w-154.   Home health services are available under Parts A, B, and C.

Medicaid created a similar program for low-income Americans.   While Medicare is administered by the Social Security Administration, Medicaid was designed as a partnership under which states and the federal government would share the cost of providing medical care to the poor. *Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136, 139 (2d Cir. 2001). Medicaid programs are administered by state agencies such as the Department of Vermont Health Access. *See* Dep't of Vt. Health Access, http://ovha.vermont.gov/ (last visited July 22, 2015).   These agencies pay for the cost of their participants' health care through a mixture of federal and state tax dollars.

The two programs have grown and changed over the course of the last fifty years. Medicare accounts for 20% of current health spending in the United States.   NHE Fact Sheet, Centers for Medicare & Medicaid Services, http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet.html (last visited July 22, 2015).   Medicaid accounts for an additional 15%. *Id*.   In 2013, Medicaid spending grew by 6.1%—almost twice the rate of Medicare spending, which grew 3.4 %. *Id*.

From the inception of these programs, their different structures and the overlapping populations they serve have created legal and political difficulties in coordinating their systems of payments.   Medicare money is federal money administered through the Centers for Medicare and Medicaid Services, an agency within the Department of Health and Human Services.   States do not participate in Medicare. *Conn. Dep't of Soc. Servs. v. Leavitt*, 428 F.3d 138, 141 (2d Cir. 2005).   Medicaid money is a mixture of federal and state money which is administered through state agencies. *Id*.   States benefit if an expense is covered by Medicare instead of Medicaid.   For these reasons, litigation over issues of "who pays" and which program takes priority for an expense has occurred with great frequency and in many different factual settings over recent decades. *See, e.g.*, *id*.; *N.Y.C. Health & Hosp. Corp. v. Perales*, 954 F.2d 854 (2d Cir. 1992); *N.Y. State Dep't of Soc. Servs. v. Bowen*, 846 F.2d 129 (2d Cir. 1988).

This case concerns a particular subset of the problem of whether Medicare or Medicaid pays for care. Patients who qualify for both Medicare and Medicaid (so-called "dual eligibles") frequently receive nursing services and therapy at home in place of care in a nursing home or similar institution. In theory Medicare is the first priority payer and Medicaid is the payer of last resort. *Conn. Dep't of Soc. Servs.*, 428 F.3d at 141; 42 U.S.C. § 1396a(a)(25). If a claim for home health care is denied by Medicare, it is frequently submitted to Medicaid and paid through that system. When this happens, costs are shifted from the federal to the state program. Because the Medicaid standards for payment of home health charges are different and in some respects less exacting than Medicare, there are occasions when Medicaid will be the appropriate agency to pay for home health care provided to a "dual eligible" person. *Compare* 42 U.S.C. §§ 1396a(10)(A), (D); 1396d(a)(7), *with* 42 U.S.C. §§ 1395f(a)(2)(C); 1395n(a)(2)(A); 1395x(m).

Plaintiffs in this case are "dual eligible" recipients of both Medicaid and Medicare. Both receive home health care. In both cases, their claims for payment by Medicare were rejected. Their claims were reimbursed through the Medicaid program instead. Neither is personally liable for the cost of the care at issue.

**B.    Eligibility for Home Health Benefits under Medicare**

Eligibility for home health benefits under Medicare is determined by statute, 42 U.S.C. § 1395f(a)(2)(C), and further defined by regulation, 42 C.F.R. § 409.42. To receive coverage for home health services, an individual must be "confined to the home," under the care of a physician, in need of skilled services, and under a plan of care established and certified by his or her treating physician. 42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. § 409.42. Services must be provided by a recognized home health agency. *Id.* In the case of both named plaintiffs in this action, coverage for home health care services they received was denied on the grounds that they were not "confined to the home."

**C.    Claims Review and Persuasive Authority of a Prior Favorable Ruling**

Medicare pays for home healthcare services through contractors known as Medicare Administrative Contractors (MACs). 42 C.F.R. § 421.3. MACs were formerly known as "fiscal intermediaries" for Part A and "carriers" for Part B. *Zanecki v. Health Alliance Plan of Detroit*,

577 F. App'x 394, 398 (6th Cir. 2014). The contractors are frequently private health insurers who contract with the Medicare program to provide claims services. When a claim is submitted, the MAC makes an initial determination regarding whether the services will be covered. 42 C.F.R. § 405.904(b).

The Medicare Program Integrity Manual (MPIM) provides guidance to MACs in handling all types of claims, including claims for home health benefits. Centers for Medicare & Medicaid Servs., Pub. 100-08, Medicare Program Integrity Manual, http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019033.html. Section 6.2, "Home Health," instructs MACs to promptly pay all claims following a favorable final appellate decision that a beneficiary is confined to the home. MPIM § 6.2.1(A). The claims reviewers are instructed to establish procedures ensuring favorable treatment and to notify the beneficiary and his or her home health agency that the favorable decision will be given "great weight" in evaluating whether the beneficiary is confined to the home. *Id.*

The beneficiary may request a redetermination of an adverse decision. 42 C.F.R. § 405.904(b). If dissatisfied with the redetermination, the beneficiary may then request a reconsideration of the claim by the "Qualified Independent Contractor" (QIC). *Id.* In reconsidering the claim, the QIC provides "an independent, on-the-record review of an initial determination, including the redetermination and all issues related to payment of the claim." 42 C.F.R. § 405.968(a)(1). Although the MPIM is not binding upon the QIC, he or she must "give substantial deference to these policies [set out in the Manual] if they are applicable to a particular case." *Id.* § 405.968(b)(2). A QIC may decline to follow a policy set forth in the manual "if the QIC determines, either at a party's request or at its own discretion, that the policy does not apply to the facts of the particular case." *Id.*

From the QIC's decision, the beneficiary may appeal to an administrative law judge (ALJ), and then to the Medicare Appeals Council. 42 C.F.R. § 405.904(b). The ALJ and the Appeals Council also are not bound by the MPIM. They are expected, however, "to give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. § 405.1062(a). If the ALJ or the Appeals Council departs from a policy set out in the manual, they must explain their reasons for doing so. *Id.* § 405.1062(b).

### D.     The Particular Claims

#### i.       Marcella Ryan

Plaintiff Marcella Ryan was fifty-nine years old at the time the complaint was filed.  She suffers from cerebral palsy and muscular dystrophy as well as other serious ailments.  She is legally blind.  She is limited to bed or to a wheelchair.  She is frequently hospitalized.  She appeals her denial of Medicare benefits to this court for the period April 2009 to July 2010. (Doc. 5 ¶¶ 34-36.)

Ryan has received home health care since at least 1998.  Between 1998 and April 2009, she received at least seven initial denials of eligibility for Medicare home health benefits.  Each denial covered a separate sixty-day period.[1]  On each occasion, Ryan filed an appeal and was determined to be eligible by an ALJ assigned to her case.  The two ALJ decisions closest in time to the period in dispute in this case cover the periods February to April 2007 and February 2008 to April 2009.  Both decisions determined that Ryan was eligible for Medicare because she was unable to leave her home and required skilled nursing services.  (*Id.* ¶¶ 37-40.)

For the period April 2009 to July 2010, Ryan has exhausted the administrative process established for the review of Medicare claims.  Her initial claim for the period in question was denied.  She sought redetermination and was denied again.  The reason for denial was that she was found not to be "confined to the home" within the meaning of the Medicare law and regulations.  These denials were upheld by the QIC and subsequently by the ALJ.  Her last appeal was to the Appeals Council which denied her claim in October 2014.  (*Id.* ¶¶ 50-62.)

#### ii.       John Herbert

Plaintiff John Herbert is fifty-two years old.  He was rendered quadriplegic in a skiing accident in 1992.  He is wheelchair bound.  He suffers from multiple medical problems related to his paralysis.  He has received home health care since at least September 1997.  He appeals to this court his denial of Medicare benefits for the period August 2010 to June 2011.  (*Id.* ¶¶ 69-72.)

---

[1]  Medicare approval of home health benefits typically covers a sixty-day certification period.  42 C.F.R. § 484.205.

Like Ryan, Herbert has frequently been denied Medicare home health benefits at the time of initial application.  He has appealed these decisions and has always succeeded.  Since September 1997, he has received one partially favorable redetermination decision, one partially favorable final appellate decision, and five fully favorable final appellate decisions.  The most recent favorable decision before the period in dispute came in November 2010 when he received a fully favorable decision from ALJ Arthur Liberty for the period October to February 2009.  (*Id.*)

Herbert has been unsuccessful in obtaining home health benefits through Medicare for the period August 2010 to June 2011.  He received an initial denial which was upheld when he requested redetermination.  His claim was also rejected by the QIC and later by an ALJ.  He filed a request for review with the Medicare Appeals Council in October 2014.  On April 3, 2015, the Appeals Council affirmed the decisions below.  (*Id.* ¶¶ 82-89; Doc. 23-1.)

## II.    Analysis

The Secretary moves to dismiss plaintiffs' complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim for which relief may be granted under Rule 12(b)(6).  The Secretary argues that (1) plaintiffs lack standing to sue; (2) plaintiff Herbert has failed to exhaust his administrative remedies; (3) neither plaintiff has established the basis for mandamus jurisdiction; (4) the alleged failure to follow the provisions of the MPIM will not support a cause of action; (5) the availability of the administrative review process renders any error by the MACs harmless; and (6) the relief sought by plaintiffs exceeds the court's powers.  (Doc. 19.)

### A.    Standard of Review

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Plaintiffs have the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists in their case.  *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996).  The court assumes for the purposes of the motion that the factual allegations of the complaint are true, but must not draw inferences favorable to plaintiffs.  *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).  In

considering whether subject matter jurisdiction exists over a claim, the court may consider affidavits and other matters outside the pleadings. *Id.*

For the purposes of a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court accepts as true the factual allegations of the complaint and draws all inferences in favor of the plaintiffs. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## B.  Whether Plaintiffs Have Standing to Bring Their Claims

Article III of the Constitution limits the judicial power of federal courts to "Cases" and "Controversies." U.S. Const. Art. III, § 2.  The Supreme Court has interpreted this provision to require that a person who seeks to have a federal court resolve a dispute must demonstrate that he or she has standing to bring a claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  That is, the litigant must prove "that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013).

Standing has two aspects:  the constitutional requirement that the dispute concern a case or controversy and additional prudential requirements which require parties to assert rights which are personal to them and not those held by the citizenry as a whole or by a third party.  In this case, the parties and the court agree that the standing issue presented is of the constitutional variety. The claim by the Government is that the plaintiffs have not suffered the requisite injury-in-fact because the charges denied by Medicare were subsequently covered by Medicaid.

The court is satisfied that plaintiffs have constitutional standing to bring this suit for several reasons.  First, they are seeking to protect a right to Medicare coverage which is theirs by virtue of their qualification for benefits under the statute—even if Medicaid is also willing to cover the charges in question.  Second, the adverse Medicare determination in their cases gives rise to a legal rule which may impose personal liability on them for future uncovered services. Third, by virtue of her age, plaintiff Ryan faces the possibility that the Medicaid program will seek to recover benefits from her estate after her death.  Finally, both Herbert and Ryan have

7

identified other specific respects in which Medicare and Medicaid do not provide identical benefits and which resulted in specific harm to them.  All four of these factors support a determination that plaintiffs have standing in this case.  The court will consider them in order.

### i.     Plaintiffs' Interest in Suing to Protect Their Medicare Benefits Even Though Medicaid Pays

The standing problem is no stranger to "dual eligible" litigation over Medicare entitlements.  By reason of their dual eligibility, plaintiffs in these cases typically have recourse to Medicaid.  Courts which have considered whether a claimant has standing to sue for Medicare benefits even though Medicaid has already paid the bill or is prepared to do so have frequently identified a right—separate from personal financial interest—to be heard regarding their entitlement to Medicare coverage.

The place to start with the analysis of whether plaintiffs have standing to sue is with the statute which authorizes their lawsuit in the first place.  Section 405(g) of Title 42 of the United States Code establishes a right of judicial review for anyone who takes issue with a final decision of the Commissioner of Social Security.  This provision provides both the substance and the standing for a lawsuit in federal court concerning entitlement to Medicare benefits.  *Heckler v. Ringer*, 466 U.S. 602, 620 (1984); 42 U.S.C. § 1395ff(b).  Except for the availability of similar coverage from the Medicaid program, there would be little question about the legal right of these plaintiffs to bring suit in the same manner as anyone else who believes they have been wrongfully denied benefits under the Social Security Act.

The issue which complicates standing is the availability of Medicaid.  All but one of the handful of courts which have considered this issue have held that the dual eligible claimant has standing to sue to defend his or her entitlement to a statutory benefit—even when the medical bill in dispute is also covered by Medicaid.

In *Martinez v. Bowen*, 655 F. Supp. 95, 99 (D.N.M. 1986), the court rejected the argument that a Medicare claimant lacked standing to bring suit to contest the denial of her claim because the medical tests at issue were paid for by Medicaid.  The district court identified the claimant's "direct personal injury of losing Medicare reimbursement for daily blood tests without a pre-termination hearing" as the injury-in-fact required by the standing doctrine.  *Id*.  The

claimant's property interest in the Medicare benefits which she had earned by virtue of her age and her payment of social security taxes gave her a personal stake in the outcome of the case even though Medicaid had stepped forward to provide coverage for the disputed tests.

In *Longobardi v. Bowen*, No. H-87-628, 1988 WL 235576 (D. Conn. Oct. 25, 1988), the surviving son of a Medicare beneficiary was permitted to pursue his late mother's claim for benefits even though the services for which he sought reimbursement were covered in full under the Connecticut Medicaid program. The court found standing "merely by virtue of the alleged denial of statutorily-created rights or entitlements" even in the absence of financial loss. *Id.* at *2. Relying upon *Warth v. Seldin*, 422 U.S. 490 (1975), the court explained:

> It is irrelevant to the question of standing whether the entitlement would *actually* result in a monetary payment to the claimant. Mrs. Longobardi's stake in the outcome of this action is not in receiving a Medicare payment; it is in the distribution of a benefit payment which comprises a portion of her Medicare entitlement.

*Id.*

The District of Vermont reached a similar conclusion in *Anderson v. Sebelius*, No. 5:09-cv-16, 2010 WL 4273238 (D. Vt. Oct. 25, 2010), in which a Medicare beneficiary sued to obtain Medicare coverage for services denied as not reasonably necessary even though she had no personal financial responsibility for the cost of services. The court determined that the beneficiary retained standing to sue because, among other reasons, she was seeking to enforce her statutory right to Medicare coverage. *Id.* at *2-3. The *Anderson* decision is a little different from this case because the claimant was relieved of personal responsibility for the unpaid charges. The court considered both issues of mootness and standing and concluded that the claimant remained the correct party to bring suit even though they were free from any liability for the unpaid charges.

The principle that a person may sue to enforce a statutory right in the absence of an out-of-pocket loss or other concrete harm was recognized in *Warth v. Seldin*, 422 U.S. 490, 500 (1975) in which the Court wrote:

> The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. . . . Essentially, the standing question in such cases is whether the

> constitutional or statutory provision on which the claim rests properly can
> be understood as granting persons in the plaintiff's position a right to
> judicial relief.

*Id.* (citations and quotation omitted).  For standing purposes, it can be sufficient for persons suing in a representative capacity—as these plaintiffs seek to do—to demonstrate that they possess a statutory right which has been denied even if they have not lost money or suffered other tangible harm.  Courts applying this principle have found standing in a wide range of cases in which the individual injury may be highly attenuated.  *See Graczyk v. W. Pub'g Co.*, 660 F.3d 275, 278 (7th Cir. 2011) (finding individual drivers had standing arising out of alleged violation of Drivers' Privacy Protection Act); *DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) (finding credit card holder had standing to assert statutory rights on behalf of class under the Truth in Lending Act); *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 711-12 (N.D. Cal. 2011) (finding users of social networking website had standing to assert violations of rights under the federal Wiretap Act).

In this case, the plaintiffs' statutory right to receive Medicare benefits and to file suit under 42 U.S.C. § 405(g) when these are denied is beyond question.  Since plaintiffs have both a statutory entitlement to Medicare coverage and the right to file suit, they satisfy the criteria set out in *Warth* for parties whose standing rests upon their statutory rights even in the absence of direct financial harm or other loss.  Subject to the requirements for class certification which are not considered here, they could serve as class representatives even in the absence of financial loss.

### ii.      Statutory Presumption of Knowledge of Non-Coverage

The standing requirement is also satisfied by plaintiffs' allegations that because their claims for home health care services have been denied, they are now considered to be on notice of Medicare's likely non-coverage (Doc. 1 ¶¶ 68, 93.)  Under the Medicare regulations, a beneficiary is generally not personally liable for the cost of health care he or she receives for which coverage is later denied if the beneficiary did not know that the service was not covered. 42 U.S.C. § 1395pp.  The medical provider—not the beneficiary—suffers the loss.  *Id.*  But once the beneficiary is on notice that an aspect of his or her care may not be covered by Medicare, he or she may be held financially responsible for the cost of the care.  *See Dennis v. Shalala*, No.

5:92-cv-210, 1994 WL 708166, at *1 n.1 (D. Vt. Mar. 4, 1994); 42 U.S.C. § 1395pp(b) (providing that Medicare will indemnify individual for uncovered services unless individual knew or could be expected to know that such services were uncovered); 42 C.F.R. § 411.404. This court has previously recognized that this presumption of knowledge and the ensuing potential for personal liability changes the Medicare beneficiary's rights and obligations in a way sufficient to establish standing. *See Anderson*, 2010 WL 4273238, at *4 ("[I]f the ALJ's denial of coverage is ultimately affirmed, Plaintiff will retain an injury-in-fact because she will be presumed to have knowledge that the denied services will not be covered in the future and will thus be legally bound to her detriment by the outcome of this case. This constitutes an injury-in-fact for standing purposes." (citation omitted)).

The court respectfully disagrees with the decision of the district court in *Hull v. Burwell*, 66 F. Supp. 3d 278 (D. Conn. 2014), which involved similar claims by Medicare beneficiaries. The court held that the plaintiffs' potential future liability for uncovered or denied claims was insufficient to create standing because "[t]he predicted harm is wholly contingent upon the future acts or omissions of third parties." *Id.* at 283. But once an individual is notified "that there is no Medicare payment for a service that is not covered by Medicare, he or she is presumed to know that there is no Medicare payment for any form of subsequent treatment for the non-covered condition." 42 C.F.R. § 411.404(b). Thus, the presumption is created as soon as the individual receives notice that his or her claim has been denied. As these plaintiffs have chronic long-term health care needs, this court does not find the possibility of future harm arising from the presumption to be so remote that plaintiffs lack standing. Certainly at the motion to dismiss stage, their allegations that they may become responsible for future expenses suffice to establish standing. *Lujan*, 504 U.S. at 561.[2]

### iii.        Future Estate Consequences

The recoupment of Medicaid expenditures by state governments from the estates of beneficiaries has been a feature of Medicaid law since 1982. *See* 42 U.S.C. § 1396p. In

---

[2] In addition to the above injuries, plaintiffs allege that the Secretary's failure to follow the MPIM policy has resulted in their receiving fewer reasonable and necessary home health services or losing such services altogether, because providers refuse to provide services for which they believe they will not be paid. (Doc. 1 ¶ 99; Doc. 32 at 14.)

Vermont, anyone who receives Medicaid benefits at age fifty-five or older and leaves an estate valued at more than $2,000 at the time of death (with certain exceptions for the inheritance of homesteads not relevant here) is subject to this recovery program. Vt. Medicaid Covered Services Rule 7108.3, Vt. Admin. Code 12-7-1:7108. This is not a hypothetical program, and the dollar limit of $2,000 is low enough to have broad application. Although it is unknown at this time whether plaintiff Ryan will leave an estate subject to Medicaid recovery, each dollar she receives now in Medicaid benefits increases the amount of the potential recovery. If her estate meets criteria for recovery, the home health benefits at issue in this case may be included in the calculation of her estate's obligation to the Medicaid program.

The Second Circuit touched on this aspect of the standing issue in *Connecticut Department of Social Services v. Leavitt*, 428 F.3d 138 (2d Cir. 2005). The case also involved the priority of home healthcare expenses incurred by dual eligible participants. The lead plaintiff was the Connecticut health agency which administers the Medicaid program. Individual claimants also joined in the action. Before reaching the merits of the dispute, the court addressed the issue of standing for the individual claimants. "The dual eligibles care whether Medicare or Medicaid pays for their home health-care services because if Medicaid pays and is not reimbursed, Connecticut may levy against their estates for the cost of services provided while they were living." *Id.* at 142. The same concern about future consequences to Ryan's estate supports standing in her case.

### iv.      Other Collateral Consequences

Although the Medicare and Medicaid programs are very similar from the perspective of the beneficiary, they are not identical and the differences which exist are more favorable to the recipient of Medicare. In 2012 Vermont imposed a co-payment for one year on prescriptions and durable medical equipment and supplies paid for by Medicaid. 2012 Acts & Resolves No. 162 (Adj. Sess.) § E.307.2. The co-payment was in effect during a period following the claims in these cases and does not affect the standing issue. The co-payment for durable medical equipment and supplies was repealed the following year. 2013 Acts & Resolves, No. 50, § E.307.6.

In addition, however, plaintiff Herbert alleges that the process of ordering home health supplies is substantially more convenient for Medicare recipients. (Doc. 32-3 ¶ 5.) Plaintiff Ryan alleges that the denial of Medicare has resulted in her receiving fewer reasonable and necessary home health services or losing such services altogether because providers refuse to provide services for which they believe they may not be paid. (Doc. 1 ¶ 99; Doc. 32-1 ¶¶ 4-5.) For purposes of standing, the court accepts as true plaintiffs' allegations that they experience denial of services and inconvenience due to the denial of their Medicare benefits. These allegations support a further determination that plaintiffs have already suffered an actual, concrete injury as a result of the denial of their Medicare claims.

These four bases for standing provide sufficient support to meet the constitutional requirement of justiciability. The court declines to dismiss the action on standing grounds.

### C.    Whether the Court Has Subject Matter Jurisdiction

In their complaint, plaintiffs allege that this court has jurisdiction to hear their claims under the appeals provision of the Social Security Act, 42 U.S.C. § 405(g), as well as federal question jurisdiction under 28 U.S.C. §1331 and mandamus jurisdiction under 28 U.S.C. § 1361. (Doc. 5 ¶ 6.) The Secretary originally argued that the court lacks § 405(g) jurisdiction over plaintiff Herbert's claim because he has failed to exhaust his administrative remedies. The Secretary has withdrawn this argument in light of the decision of the Appeals Council affirming the ALJ's decision denying home health benefits to Herbert. (Doc. 23-1 at 2.) The Secretary further argues that the court lacks mandamus and federal question jurisdiction over plaintiffs' claims.

Mandamus is an extraordinary remedy that is available only if the petitioner shows "(1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available." *Anderson v. Bowen*, 881 F.2d 1, 5 (2d Cir. 1989). Mandamus relief is not available in this action because plaintiffs may obtain relief through direct appeal under 42 U.S.C. § 405(g). *See Aref v. United States*, 452 F.3d 202, 206 (2d Cir. 2006) ("If relief may be obtained by direct appeal, mandamus is inappropriate."); *Landers v. Leavitt*, No. 3:04–cv–1988, 2006 WL 2560297, at *2 (D. Conn. Sept. 1, 2006) (holding that court had jurisdiction under 42 U.S.C. § 405(g) over

Medicare beneficiaries' class action challenging Secretary's interpretation of coverage regulation, and thus mandamus jurisdiction was unnecessary and federal question jurisdiction was barred).

Similarly, because the court has jurisdiction under § 405(g) to hear plaintiffs' claims, it does not have federal question jurisdiction under 28 U.S.C. § 1331.  *See* 42 U.S.C. § 405(h) ("No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."); *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 10 (2000) (explaining that § 405(h) "plainly bars § 1331 review" of Medicare appeal "irrespective of whether the individual challenges the agency's denial on evidentiary, rule-related, statutory, constitutional, or other legal grounds").  As discussed above, the lack of mandamus or federal question jurisdiction is not fatal to plaintiffs' claims because they have established jurisdiction under 42 U.S.C. § 405(g).

### D.      Whether Plaintiffs Have Stated a Claim for Which Relief May Be Granted

The Secretary argues that plaintiffs cannot state a claim against her for failure to follow the MPIM in adjudicating Medicare appeals because the MPIM is essentially an interpretive rule which does not have legal effect and cannot bind her agency.

Plaintiffs allege that the Secretary has failed, at all levels of review, to adhere to her own policy as expressed in the MPIM.  Section 6.2.1 of the MPIM provides:

> [MACs] are instructed to do the following when a favorable final appellate decision that a beneficiary is "confined to home" is rendered on or after July 1, 2000. . . .
>
> Promptly pay the claim that was the subject of the favorable final appellate decision. Promptly pay or review based on the review criteria below: All claims that have been denied that are properly pending in any stage of the appeals process. All claims that have been denied where the time to appeal has not lapsed. All future claims submitted for this beneficiary. . . .
>
> Establish procedures to ensure that medical review of a beneficiary's claim, after the receipt by that beneficiary of a favorable final appellate decision related to "confined to home," is reviewed based on the review criteria below.

Notify the beneficiary and the affected home health agency that the favorable final appellate decision related to "confined to home" will be given "great weight" in evaluating if the beneficiary is "confined to home." Inform them of what steps should be taken if they believe a claim has been denied in error.

Maintain records containing information on the beneficiaries receiving favorable final appellate decision related to "confined to home." . . .

B. Review Criteria

Afford the favorable final appellate decision that a beneficiary is "confined to home" great weight in evaluating whether the beneficiary is confined to the home when reviewing services rendered after the service date of the claim addressed in the favorable final appellate decision unless there has been a change in facts (such as medical improvement or an advance in medical technology) that has improved the beneficiary's ability to leave the home. All medical review that is done on claims for services performed after the service date of the claim that is addressed in the favorable final appellate decision should determine if (a) there has been a change in facts (as noted above) that affects the beneficiary's ability to leave the home and (b) if the services provided meet all other criteria for home health care. If there have been no changes in facts that affect the beneficiary's ability to leave the home and if all other criteria for home health services are met, the claim would ordinarily be paid.

The Medicare regulations state that in reviewing the initial contractor determinations, QICs, ALJs, and the Medicare Appeals Council are not bound by manuals such as the MPIM, "but will give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. §§ 405.968(b); 405.1062(a). If a QIC, ALJ, or the Appeals Council declines to follow a manual instruction in a particular case, it is required by the regulations to explain why the policy was not followed. 42 C.F.R. §§ 405.968(b); 405.1062(b).

Plaintiff Ryan alleges that she received two favorable final appellate decisions finding her to be confined to the home during the periods of February 9, 2006 to April 7, 2007 and February 8, 2008 to April 6, 2009. (Doc. 5 ¶¶ 38-39.) Despite these decisions, the MAC denied coverage for home health care services she received from April 2009 to July 2010. (*Id.* ¶ 50.) Upon reconsideration, the MAC upheld the denial of coverage, but did not address the prior favorable decisions or document any change in plaintiff Ryan's condition that affected her ability to leave her home. (*Id.* ¶¶ 51-52.) The QIC also upheld the denial of coverage without addressing the prior favorable decisions or explaining its reasoning, and did not give substantial deference to the MPIM. (*Id.* ¶ 54.) The ALJ also upheld the denial, and did not give substantial deference to the

15

MPIM, concluding that it only applied to Medicare contractors. (*Id.* ¶¶ 57-58.) Plaintiff Herbert makes similar allegations. (*Id.* ¶¶82-89.) In both of their cases, the Medicare Appeals Council upheld the denial of coverage. Plaintiffs allege that the Appeals Council has ruled in other appeals that MPIM § 6.2.1 should be applied at the ALJ and MAC levels, but did not do so in their cases. (*Id.* ¶ 61.)

Plaintiffs' allegations are sufficient to state a claim under the "long-settled principle that the rules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency." *Montilla v. I.N.S.*, 926 F.2d 162, 166 (2d Cir. 1991). Particularly "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974). This principle is known as the *Accardi* doctrine, after *U.S. ex rel. Accardi. v. Shaughnessy*, 347 U.S. 260, 268 (1954), in which the Supreme Court reversed a deportation order of the Board of Immigration appeals because the Board failed to follow its own regulations. "The *Accardi* doctrine is premised on fundamental notions of fair play underlying the concept of due process." *Montilla*, 926 F.2d at 167; *see also Int'l House v. N.L.R.B.*, 676 F.2d 906, 912 (2d Cir. 1982) (explaining that an agency's failure to follow its own guidelines "tends to cause unjust discrimination and deny adequate notice contrary to fundamental concepts of fair play and due process").

The Secretary correctly points out that not all agency rules are binding upon an agency. *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (finding that failure of agency employee to follow Social Security Claims Manual did not estop the agency from denying benefits to claimant). "The general consensus is that an agency statement, not issued as a formal regulation, binds the agency only if the agency intended the statement to be binding." *Farrell v. Dep't of Interior*, 314 F.3d 584, 590 (Fed. Cir. 2002) (collecting cases). The intent of the agency is determined by examining the language of the rule, its context, and any extrinsic evidence. *Chiron Corp. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 944 (D.C. Cir. 1999). "[M]andatory, definitive language is a powerful, even potentially dispositive, factor suggesting" that a rule is intended to be binding. *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987). Another relevant factor is whether the agency has stated an intention to be bound by the language. *Chiron*, 198 F.3d at 944; *Service v. Dulles*, 354

U.S. 363, 379 (1957). Further, manuals or procedures may be binding on an agency when they affect individuals' rights. *See Morton*, 415 U.S. at 235 (holding that agency is bound by procedures in its manual where individual's entitlement to government benefits was affected by procedures); *Montilla*, 925 F.2d at 167.

Section 6.2.1 and the relevant Medicare regulations are both phrased in mandatory language. MACs "are instructed to do the following when a favorable final appellate decision that a beneficiary is 'confined to home' is rendered . . . [a]fford the favorable final appellate decision that a beneficiary is 'confined to home' great weight in evaluating [subsequent claims] . . . unless there has been a change in facts." MPIM § 6.2.1. The Medicare regulations state that QICs, ALJs and the Appeals Council "*will* give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. §§ 405.968(b); 405.1062(a) (emphasis added). If the ALJ or Appeals Council declines to give the manual substantial deference, it "*must* explain the reasons why the policy was not followed." 42 C.F.R. § 405.1062 (emphasis added). Through these regulations, the agency has expressed its intention to be bound by the provisions of the manuals. Additionally, plaintiffs allege that the Appeals Council itself has previously recognized that it must give substantial deference to § 6.2.1 of the MPIM. The rule is not merely procedural—it directly affects plaintiffs' rights to receive insurance benefits for home health care services. All of these factors support a conclusion that the rule is intended to be binding upon the MACs and—through the operation of the Medicare regulations—the QICs, ALJs, and Appeals Council.

The availability of multiple stages of administrative review of a MAC decision does not defeat plaintiffs' claims by rendering an improper decision "harmless," as the Secretary argues. (Doc. 19 at 23.) Plaintiffs allege a system-wide practice of using an improper standard to decide home health care claims that is inconsistent with the Secretary's own rules. (Doc. 5 ¶¶ 1-5.) Accepting plaintiffs' allegations as true, an error by the MAC is not "cured by the plaintiffs' opportunity to make their arguments at the second, third, and final levels" because the rule is not followed at each of these levels. (Doc. 19 at 24.) Plaintiffs' claim is therefore different from a case where a claimant is merely arguing that the agency incorrectly applied the rule in his or her individual case. *See Bowen v. City of New York*, 476 U.S. 467, 485 (1986) (holding that social security claimants were not required to exhaust administrative remedies where there was "a

systemwide, unrevealed policy that was inconsistent in critically important ways with established regulations," making agency review futile).

Finally, the Secretary objects that the relief sought by plaintiffs exceeds that which the court should grant. Plaintiffs seek, *inter alia*, injunctive relief directing the Secretary to enforce MPIM § 6.2.1 in future, to revise any rules that are responsible for the failure of MACs to follow the rule, to correct internal guidelines and educate employees as to the correct approach for deciding home health care claims, to monitor the compliance of MACs and QICs with the rule, and to re-review plaintiffs' claims. (Doc. 5 at 23-24.) The Secretary argues that this would be a "wholesale" restructuring of agency programs better left to the agency and Congress. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990). The court disagrees. Plaintiffs' claims involve the improper application of a specific policy promulgated by the agency itself in a fashion that has harmed plaintiffs, a situation that the *Lujan* decision recognizes as actionable. *See id.* (holding that agency regulation is not ripe for judicial review "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him"). And as plaintiffs correctly point out, broad injunctive relief is commonly sought and obtained in cases of this type. *See, e.g., Jimmo v. Sebelius*, No. 5:11-CV-17, 2011 WL 5104355, at *2 (D. Vt. Oct. 25, 2011) (describing relief sought by Medicare beneficiaries who alleged Secretary had adopted unlawful and clandestine coverage determination standard); *id.* (Doc. 83-1 at 4-6).

## III.     Conclusion

For the reasons stated above, defendant's motion to dismiss plaintiffs' complaint is DENIED.

Dated at Rutland, in the District of Vermont, this 27th day of July, 2015.

Geoffrey W. Crawford, Judge
United States District Court